UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

JAY KEITH TURNER,               CIVIL ACTION
       Appellant           NO. CV07-0645

VERSUS

MICHAEL J. ASTRUE, COMMISSIONER    JUDGE JAMES T. TRIMBLE
OF SOCIAL SECURITY,          MAGISTRATE JUDGE JAMES D. KIRK
       Appellee


REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

Jay Keith Turner ("Turner") filed applications for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI") on January 16, 2003, alleging a disability onset date of May 20, 2002 (Tr. pp. 65, 436). Those applications were denied by the Social Security Administration ("SSA") both initially (Tr. pp. 46, 431) and on reconsideration (Tr. p. 426).

A de novo hearing was held before the administrative law judge ("ALJ") on June 20, 2005, at which Turner appeared with his attorney, a vocational expert ("VE"), and a witness (Tr. p. 454). The ALJ found that, although Turner suffers from severe impairments of chronic back pain, bipolar disorder, depression, hepatitis C, chronic shortness of breath, and a history of polysubstance abuse currently in remission, he has the residual functional capacity to perform light work except for ascending and descending stairs, more than occasional balancing, stooping, crouching, kneeling, and

crawling, or work involving hazardous machinery and unprotected heights, and can only work in a job that is low stress, simple, unskilled, with one, two, or three step instructions, not in close proximity to coworkers, and not in direct contact with the public (Tr. pp. 20-24). The ALJ concluded there are jobs existing in significant numbers in the national economy which Turner can perform, such as tube operator, surveillance system monitor, or photo copy editor (Tr. pp. 25-26), and Turner was not under a disability as defined in the Social Security Act at any time through the date of the ALJ's decision on October 28, 2005 (Tr. p. 26).

Turner requested a review of the ALJ's decision, but the Appeals Council declined to review it (Tr. p. 8), and the ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner").

Turner next filed this appeal for judicial review of the Commissioner's decision. Turner raises the following grounds for relief on appeal:

> 1. The ALJ erred in finding Turner's statements were not credible.
>
> 2. The ALJ did not give sufficient weight to the findings and opinions of the treating physicians.

In the meantime, Turner apparently filed a second application for SSI benefits on April 9, 2007. That application was granted by an ALJ on February 9, 2008, who found Turner's mental conditions (depression, bipolar disorder, and personality disorder) met the criteria for Listing 12.04(C)(2)&(3) and Listing 12.08 and awarded

SSI benefits from the date of Turner's application, on April 9, 2007 (See Doc. 19), in accordance with 20 C.F.R. § 416.330.[1]

## Eligibility for Benefits

To qualify for SSI benefits, a claimant must file an application and be an "eligible individual" as defined in the Act. 42 U.S.C. 1381(a). Eligibility is dependent upon disability, income, and other financial resources. 42 U.S.C. 1382(a). To establish disability, plaintiff must demonstrate a medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than 12 months. Plaintiff must also show that the impairment precludes performance of the work previously done, or any other kind of substantial gainful employment that exists in the national economy. 42 U.S.C. 1382(a)(3).

To qualify for disability insurance benefits, a plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. 416(i), 423. Establishment of a disability is contingent upon two findings. First, a plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. 423 (d)(1)(A). Second, the

---

[1] The earliest month for which an eligible SSI claimant can receive benefits is the month following the month his application was filed, 20 C.F.R. § 416.335, or the month following the month during the pendency of the application that the claimant meets all the eligibility requirements, 20 C.F.R. § 416.330(a).

impairments must render the plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy.  42 U.S.C. 423(d)(2).

## Scope of Review

In considering Social Security appeals such as the one that is presently before the Court, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors.  McQueen v. Apfel, 168 F.3d 152, 157 (5th Cir. 1999).  For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance.  Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994), citing Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 482 (1971).  Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision but must include a scrutiny of the record as a whole.  The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight.  Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder.  Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983). The resolution of conflicting evidence and credibility choices is

for the Commissioner and the ALJ, rather than the court. <u>Allen v.</u> <u>Schweiker</u>, 642 F.2d 799, 801 (5th Cir. 1981). Also, <u>Anthony v.</u> <u>Sullivan</u>, 954 F.2d 289, 295 (5th Cir. 1992). The court does have authority, however, to set aside factual findings which are not supported by substantial evidence and to correct errors of law. <u>Dellolio</u>, 705 F.2d at 125. But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence." <u>Johnson v. Bowen</u>, 864 F.2d 340 (5th Cir. 1988); <u>Dellolio</u>, 705 F.2d at 125.

<u>Summary of Pertinent Facts</u>

At the time of his administrative hearing, Turner was 41 years old (Tr. p. 458), had a ninth grade education (Tr. p. 82) and a GED (Tr. p. 459), and had past relevant work as a pipe fitter, an outside machinist, construction worker, and a heavy equipment operator (Tr. p. 459-460).

1. Medical Records

Turner's treating psychotherapist, Barry Frenchman, M.S., stated (in a letter dated March 5, 2003) that he began treating Turner on April 12, 2001, Turner's GAF score was 38 after seven sessions, and Turner could not sustain treatment because of his background, his history of child abuse, and his self medication with substances which resulted in an inability to focus and make progress (Tr. p. 244).[2] Frenchman recommended Turner enter a

---

[2] The Global Assessment of Functioning, or GAF, score represents Axis V of the Multiaxial Assessment system. The axial system of evaluation enables the clinician to comprehensively and

stabilized, supervised, and periodically monitored program with
medical management and therapy as the basis of his treatment (Tr.
p. 244).

In September 2001, Turner was examined and treated with
medications for anxiety, hepatitis C, prostatitis, palpitations,

---

systematically evaluate a client. <u>Diagnostic and Statistical
Manual of Mental Disorders, Text Revised</u>, pp. 25-30 (4th ed.
2000) ("<u>DSM-IV-TR</u>"). GAF is a standard measurement of an
individual's overall functioning level. The GAF score is a
subjective determination that represents the clinician's judgment
of the individual's *overall* level of functioning with respect to
psychological, social and occupational functioning, on a
hypothetical continuum of mental health-illness. The first
number indicates the patient's current GAF, while the second
number indicates the highest score reported in the previous year.
<u>DSM-IV-TR</u> at 32-34. The GAF scale goes from 0-100: **91-100** -
superior functioning in a wide range of activities, life's
problems never seem to get out of hand, is sought out by others
because of his or her many positive qualities, no symptoms; **81-90**
- absent or minimal symptoms, good functioning in all areas,
interested and involved in a wide range of activities, socially
effective, generally satisfied with life, no more than everyday
problems or concerns; **71-80** - if symptoms are present, they are
transient and expectable reactions to psycho-social stressors,
not more than slight impairment in social, occupational, or
school functioning; **61-70** - some mild symptoms OR some difficulty
in social, occupational or school functioning, but generally
functioning pretty well, has some meaningful interpersonal
relationships; **51-60** - moderate symptoms OR moderate difficulty
in social, occupational, or school functioning; **41-50** - serious
symptoms OR serious impairment with social, occupational, or
school functioning; **31-40** - some impairment in reality testing or
communication OR major impairment in several areas such as work
or school, family relations, judgment, thinking, or mood; **21-30** -
behavior is considerably influenced by delusions or
hallucinations OR serious impairment in communication or
judgement OR inability to function in almost all areas; **11-20** -
some danger of hurting self or others OR occasionally fails to
maintain minimal personal hygiene OR gross impairment in
communication; **1-10** - persistent danger of severely hurting self
or others OR persistent inability to maintain minimal personal
hygiene OR serious suicidal act with clear expectation of death;
and **0** - inadequate information. <u>DSM-IV-TR</u>, at 34. Also, <u>Boyd v.
Apfel</u>, 239 F.3d 698 (5th Cir. 2001).

and shortness of breath (Tr. pp. 202-203, 206). Chest x-rays were normal (Tr. p. 204).

In December 2001, Turner underwent detoxification at Meridian Behavioral Healthcare, Inc., due to cocaine and alcohol dependence (Tr. p. 190). Turner was unemployed and legal charges were pending against him (Tr. p. 189). He reported having previously tried detoxification a couple of times, as well as prior hospitalization for depression (Tr. p. 192).

In January 2002, Turner was admitted to a structured, long-term, Florida state residential drug treatment program, the Metamorphosis Program, but was discharged from the program in March 2002 because he had difficulty controlling his anger toward staff and other clients, and it was determined that the program was too intensive and too restrictive for Turner (Tr. pp. 217-218). Turner was referred to a less restrictive treatment environment (Tr. p. 218).

In July 2002, Turner, at that time homeless, voluntarily underwent detoxification for his crack cocaine addiction at Meridian Behavioral Healthcare, Inc., in Florida (Tr. pp. 135-157). Turner admitted he had smoked crack for sixteen years (Tr. p. 152). Turner had previously undergone psychotherapy for seven years and been hospitalized three times for depression (Tr. p. 173).

Turner was incarcerated from August 2002 through January 2003 (Tr. pp. 235, 226). He was diagnosed with bipolar disorder and depression (Tr. pp. 219, 224), and was treated with lithium and Paxil (Tr. pp. 220-221). His cholesterol levels were elevated (Tr.

p. 219).

In January 2003, at Shands Hospital in Florida, Turner was diagnosed with bipolar disorder (manic depression), for which he was prescribed lithium, and Hepatitis C (Tr. pp. 210-211). In August 2003, he was found to have thoracic scoliosis, and in September 2003, he was diagnosed with hypertension and schizophrenia (Tr. p. 238).

Turner was examined and evaluated at the request of Disability Determination Services by Dr. Lance L. Chodosh, a family practice and occupational medicine doctor, in April 2003. Dr. Chodosh noted Turner's chronic mental disorders and hepatitis C without evidence of cirrhosis of the liver, but found no objective evidence of physical limitations and deferred to mental health professionals with regard to Turner's psychological functioning and prognosis (Tr. pp. 245-246). Dr. Chodosh also stated that, although Turner complained of chronic back pain, there were no significant abnormal findings in his back or spinal function (Tr. p. 248).

Also in April 2003, Turner underwent a mental health evaluation and mental status assessment at the request of Disability Determination Services by Louis Legum, Ph.D., and Larry Beatch, M.S. (Tr. pp. 257-261). The conclusion was that Turner is not able to handle the responsibility for his finances "due to severe and chronic symptoms and a history of substance abuse," as well as bipolar disorder (Tr. p. 260). Turner's prognosis was guarded and it was recommended that Turner continue psychiatric

care (Tr. p. 260). At Axis I,[3] Turner had bipolar I disorder (most recent episode depressed) in partial remission and cocaine dependence and cannabis abuse both in early full remission, at Axis II there was no diagnosis, at Axis III diagnosis was deferred; at Axis IV Turner had problems with employment, and Axis V Turner's GAF score was 31 to 40 (current).

In a May 2003 mental residual functional capacity assessment by clinical psychologist Val J. Bee, made from a review of Turner's medical records only, Turner was found to have moderate limitations in the ability to maintain attention and concentration for extended periods, the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods, the ability to accept instructions and respond appropriately to criticism from supervisors, the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and the ability to set realistic goals or make plans independently of others (Tr. pp. 262-264), but appeared able to meet the mental demands of well structured task activity which involved only limited amounts of superficial interaction, assuming continued sobriety and compliance with

---

[3] The axial system of evaluation enables the clinician to comprehensively and systematically evaluate a client. Axis I refers to clinical syndromes, Axis II to developmental disorders and personality disorders, Axis III to physical disorders and conditions, Axis IV to psychosocial stressors, and Axis V to the global (overall) assessment of functioning. Diagnostic and Statistical Manual of Mental Disorders, Text Revised, pp. 25-35 (4th ed. 2000) ("DSM-IV-TR").

treatment (Tr. pp. 264-265). According to the psychiatric review technique form, Turner has an affective disorder with disturbance of mood accompanied by a full or partial manic or depressive syndrome as evidenced by sleep disturbance (bipolar), a personality disorder with inflexible and maladaptive personality traits which cause either significant impairment in social or occupational functioning or subjective distress and antisocial behavior, and substance addiction disorders in remission, with behavioral changes or physical changes associated with the regular use of substances that effect the central nervous system (Tr. pp. 266-274). Turner was found to have mild restrictions of daily living, moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace (Tr. p. 276). Additional mental residual functional capacity assessments and psychiatric review technique forms by clinical psychologist Gary W. Buffone, in November 2003, assigned the same limitations, but with moderate restrictions in activities of daily living instead of mild (Tr. pp. 305-322).

A physical residual functional capacity assessment made from a review of Turner's medical records only, in July 2003 by Dr. Nicholas H. Bancks, a diagnostic radiologist, stated Turner can occasionally lift/carry 50 pounds, frequently lift/carry 25 pounds, stand/walk six hours in an eight hour day, sit six hours in an eight hour day, push/pull without limitations, had not postural, manipulative, visual, or communicative limitations, should avoid concentrated exposure to fumes, odors, dusts, gases, poor

ventilation, and hazards relating to machinery and heights (Tr. pp. 289-296). A second residual functional capacity assessment made from a review of Turner's medical records only, in November 2003 by Dr. Terry T. Rees, a general and thoracic surgeon, assigned the same limitations, except that he also said Turner should never climb ladders or scaffolding (Tr. pp. 297-304).

In September 2003, Barry Frenchman, Turner's psychotherapist, noted he had been treating Turner since March, that Turner had attended all scheduled sessions, that he was in early remission for his cocaine dependence and cannabis abuse, and was making progress with his adjustment to his bipolar disorder (Tr. p. 243). In September, Turner's GAF score was 31-40 (Tr. p. 243).

In October 2003, it was noted at the Helping Hands Clinic of the Salvation Army that Turner was taking Wellbutrin for his high blood pressure (Tr. p. 242), and was taking lithium and Paxil for his bipolar disorder and depression (Tr. pp. 237, 241).

The Florida Department of Corrections Probation Office gave Turner five random drug screenings, in June 2001, March 2004, April 2004, January 2005, and May 2005, which were all negative (Tr. p. 369).

In October 2004, Dr. L. Bernard-Patin, a psychiatrist, conducted a mental status exam and psychiatric evaluation of Turner and diagnosed Bipolar Disorder 1 at Axis I, antisocial personality disorder at Axis II, hypertension, seasonal allergies, Hepatitis B and C, GERD, and a history of back injury at Axis IV, and a current GAF score of 45 at Axis V (Tr. pp. 377). Dr. Bernard-Patin

recommended continuing Turner's lithium and Wellbutrin and recommended him for admission into the Florida Assertive Community Treatment ("FACT") Program for community based treatment, rehabilitation, and support services for persons with severe and persistent psychiatric disabilities[4] (Tr. pp. 377-378). In November 2004, Turner's acid reflux, caused by his medications, was treated with Zantac (Tr. p. 382). In December, it was noted that Turner had been living independently in his own apartment for about one month, was socializing with other residents at his apartment complex, was taking his medications consistently, and had kept all of his medical appointments (Tr. pp. 386-390). In January 2005, Turner, still in the FACT Program, was having continued problems sleeping but did not want medication to help him sleep; his GAF score was still 45 (Tr. p. 378). The medical records from the FACT Program show that Turner continued to maintain his psychiatric treatment through May 2005 without incident (Tr. pp. 391-412). In December 2004 and January 2005, Turner was treated for irritable bowel syndrome which was probably caused by his medications, and was prescribed Protonix and Bentyl (Tr. pp. 413-417). Also in December 2004, a change in his treating psychiatrist was discussed with Turner (Tr. p. 380).

Dr. C.A. Yozgat became Turner's new FACT Program psychiatrist (Tr. pp. 392, 397, 404, 409-412). In March and April 2005, Dr. Yozgat noted that Turner was not having any medication side-effects

---

[4] A description of the FACT Program can be found at http://www.psychotherapeuticservices.com/programs/floridafact.htm.

(Tr. p. 404), had been clean (from drugs) almost three years and his GAF score was 55 (Tr. pp 397, 409). In June 2005, Dr. Yozgat reported that he had treated Turner from January 2005 through June 2005 and determined that Turner suffers from depression with anhedonia[5] and a pervasive loss of interest in almost all activities, appetite disturbance, sleep disturbance, decreased energy, feeling of guilt of worthlessness, and difficulty concentrating or thinking, and occasional paranoid thinking, and also suffers from manic syndrome with a decreased need for sleep, easily distracted, occasional hallucinations, marked restrictions of daily living, marked difficulties in maintaining social functioning, and marked difficulties in maintaining concentration, persistence, or pace. Dr. Yozgat also reported that Turner has a medically documented history of a chronic affective disorder of at least two years duration which has caused more than a minimal limitation of his ability to do basic work activities with repeated episodes of repeated decompensation, each of extended duration, residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause Turner to decompensate, and a current history of one or more years inability to function outside of a highly supportive living arrangement with

_____

[5] Anhedonia is a psychological condition characterized by inability to experience pleasure in acts which normally produce it. MEDLINEplus Health Information, Merriam-Webster Medical Dictionary: Anhedonia, *available at* http://www.nlm.nih.gov/mplusdictionary.html (a service of the U.S. National Library of Medicine and the National Institutes of Health).

an indication of continued need for such an arrangement (Tr. pp. 423-425).

In October and December 2006, Turner was examined at LSU Health Sciences Center in Lake Charles and his medications were continued there (Tr. p. 447). An x-ray of Turner's lumbar spine was normal (Tr. pp. 441-446).

## 2. Administrative Hearing

At his June 2005 administrative hearing, Turner testified that he was born in 1964, has a GED, and he started working in construction around age 19, doing pipefitting at oil refineries (Tr. pp. 458-460). Turner testified that he has also worked as an outside machinist and operated heavy equipment such as a cherry picker in construction work (Tr. p. 460). He has not worked since May 2002, when he quit his job due to deep depression (Tr. pp. 480, 482). Turner was 6 feet tall and weighed 200 pounds; he had recently lost 25 pounds due to a medication change (Tr. p. 480).

Turner testified that he is living in an apartment in the FACT Program, a nurse visits him three time a week, he sees a psychiatrist every two weeks, and he sees a physical medicine doctor about every three months (Tr. pp. 481, 485). Turner testified that he has not used cocaine since December 2002 (Tr. pp. 482-483). Turner testified that he was able to quit using cocaine because he was incarcerated and was prescribed lithium, which took away the "feelings" that made him want to use cocaine (Tr. p. 483).

Turner testified he was in the FACT psychiatric program, which was paying for him to live alone in a one-bedroom apartment (the

14

state was paying the rent and FACT was paying for the phone and utilities), and he was receiving food stamps (Tr. pp. 461-462). Turner testified that he had been living there for six months, he rode the city bus or walked to the nearby grocery store, he cooked for himself, and he cleaned his apartment (Tr. p. 462). Turner testified that he did not socialize there because, when he gets around people, he gets nervous and starts forgetting things, and he has trouble being indoors or on a bus with a lot of people around (Tr. pp. 462-463). Turner testified that his sister has helped him and taken care of him whenever he has needed it, and often drives him places (Tr. p. 463). Turner testified that he usually stays in his apartment and reads or watches TV because he becomes paranoid outside (Tr. p. 469). Turner has a lot of problems with sleeping, and was sleeping about five hours a night at the time of his hearing (Tr. p. 469). Turner testified that he has set some goals for himself, mostly medication-related, in the course of the FACT Program, but has not set goals for his future, yet. Turner testified that the FACT Program workers told him they would be able to do more for him if he gets Social Security benefits and, therefore, Medicaid benefits (Tr. p. 484).

Turner testified that he has always had mental health problems, he was sent to a psychiatrist in kindergarten, third grade, fifth grade, and sixth grade, and he was treated with medications, off and on, but he was not diagnosed as bipolar and prescribed lithium until he was about nineteen years old (Tr. p. 464). Turner testified that his mental health problems have caused

him to lose about ten jobs, mostly when he suffering from depression and anxiety (Tr. pp. 465-466).

Turner testified that his bipolar disorder causes him to feel very down, then all of a sudden he starts going "up" and the more he goes up, the less he sleeps, then when he reaches the "top" point, he starts doing crazy things that he normally would not do, until he starts to back down and gets very depressed until, sometimes, he is suicidal (Tr. p. 466). Turner believes he has ended up in the hospital on the down-swing of this cycle about ten times (Tr. p. 466). Sometimes Turner goes and stays with his sister when he is depressed (Tr. p. 467). Turner testified that, when he gets depressed, he has no energy at all (Tr. p. 473).

Turner testified that he has committed crimes when he is in a manic state (Tr. p. 467). The last time Turner was in a manic state, he ran out of gas and kicked in the window of the store he went to for gas; Turner testified that he was "completely out of it" and was not on any medication at that time (Tr. p. 467). Turner testified that he was put on medication which he had an allergic reaction to and, when they changed it, he entered his last manic phase (Tr. p. 467). Turner testified that he was still on probation for that incident (Tr. pp. 467-468). Turner further testified that he was last imprisoned in 2004, when he served three months for shoplifting a drill (Tr. p. 468).

Turner testified that he is not currently using illegal drugs (Tr. p. 467), but that he used to try to self-medicate with illegal drugs when he was depressed (Tr. p. 468).

16

Turner testified that he has feelings of guilt and worthlessness (Tr. p. 469). However, Turner said the last time he attempted suicide was ten to twelve years ago (Tr. p. 469). Turner testified he was doing a lot of dangerous things the last time he checked himself into a hospital, about three years ago (Tr. p. 469).

Turner testified that he also has had back problems for about 18 to 20 years, for which he recently started seeing Dr. Wilbur, who prescribed physical therapy (Tr. p. 470). Turner testified that Dr. Wilbur told him not to lift over five pounds, and told him that his back would get better (Tr. p. 470). Turner testified that his back hurts when he washes dishes because he has to bend some; he can wash dishes for about fifteen minutes, then he has to stop and recline for a while (Tr. pp. 470-471). Turner testified that, during an eight hour day, he has to get off his feet for about half of it, usually in a reclining position (Tr. p. 471). When Turner walks to the nearby grocery store, he usually shops for about thirty minutes, then rolls his groceries in the buggy back to his apartment (Tr. pp. 471-472).

Turner also testified that his Hepatitis C causes his stomach to swell up every two or three weeks, and then he has vomiting and diarrhea (Tr. p. 472). Turner testified that he was told that his stomach gets irritated when his liver enzymes go up (Tr. pp. 472-473). Turner testified that he cannot work when his stomach is upset (Tr. p. 473).

Turner testified that he was once stabbed fifteen times, which

damaged one of his lungs; his lung was stapled back together, but scar tissue built up so he cannot breath properly with that lung (Tr. p. 474). Turner testified that a pulmonary function study showed severe damage (Tr. p. 474). Turner also testified that he was recently diagnosed with carpal tunnel syndrome, which causes severe cramping in his hand it he has to write very much or hold anything very long (Tr. pp. 475-476). Turner was given splints to wear on his wrists at night (Tr. p. 475). Turner has problems picking up small objects from a table, but can lift his hands over his head or write his name or a short note to himself (Tr. pp. 483-484). Bending over to pick up a newspaper off the floor would cause Turner back pain (Tr. pp. 483-484).

Turner testified that the State of Florida Vocational Rehabilitation office had told him they probably could not help him due to all of his medical problems (Tr. pp. 476-477).

Turner takes Lithium, Wellbutrin, Nexium, Metoprolol, Nasonex, Clozapine, Naproxen, Dicyclomine, Protonix, and Zyrtec, which make him drowsy and dizzy, and sometimes tired (Tr. p. 478). Turner testified that he also has Flexeril for his back pain, but that he cannot take it if he has to go anywhere because it makes him too sleepy (Tr. p. 478).

Turner testified that he cannot work five days a week, eight hours a day, because of the side effects of his medications which would cause him to miss days of work, and because he cannot stand up or sit very long due to back pain (Tr. pp. 479-480).

The ALJ gave the VE a hypothetical assuming an individual of

Turner's age, education, and work experience, who could work in a low stress, simple, unskilled job with one, two or three step instructions, who could lift and carry ten pounds frequently and twenty pounds occasionally, who should avoid using stairs, can stand/walk a total of six hours in an eight hour day with breaks, sit a total of two hours in an eight hour day with breaks, can push/pull with his upper and lower extremities, can perform activities requiring bilateral manual dexterity with both gross and fine manipulations, handling and reaching, must avoid hazards in the workplace (moving machinery, etc.), cannot climb, and can only occasionally balance, stoop, crouch, kneel, or crawl (Tr. pp. 491-492). The VE testified that such an individual would not be able to perform any of his past relevant work, but could work as a tube operator (sedentary, unskilled, 1300 jobs in Florida, 20,000 nationally), surveillance system monitor (sedentary, unskilled, 400 jobs in Florida, 6100 nationally), or photocopy machine operator (light, unskilled)(200 jobs in Florida, 5000 nationally) (Tr. pp. 492-493).

In a second hypothetical, the ALJ asked the VE to assume the individual has depression which affects his ability to concentrate on complex and detailed tasks, but would remain capable of understanding and remembering, carrying out simple job instructions, and should not work in close proximity to co-workers, which means he could not function as a member of a team or be in direct contact with the public (Tr. pp. 493-494). The VE testified that such an individual could do the same jobs he already listed

(Tr. p. 494). The VE further testified that the individual would not be able to recline periodically through the work day and would not be able to miss work more than two or three days a month (Tr. pp. 497-498).

Turner's older sister, Christie Mitchell ("Mitchell"), testified that either she or Turner's mother has helped him in the past whenever he became depressed and lost his job (Tr. p. 499). In the last four years, Turner lived with his sister at first, then she placed him in a home for the mentally ill when he became so depressed that she was unable to help him (Tr. p. 500). Mitchell testified that, when she tries to take him places on the weekend, such as to a movie, he often won't go because he cannot handle all the people (Tr. p. 501). Mitchell also testified that, when he was living with her the last time, she could not get him to leave the apartment, and that his anxiety level was bad if he just had to cross the street (Tr. p. 501). Mitchell testified that Turner would to go work and do his work when he was on a high cycle, but he could not work when he crashed in a low cycle, and that his cycles changed every four to six months (Tr. p. 502). Mitchell testified that, when Turner is low, he doesn't care if he dies and he doesn't care if he eats, and that's when she takes him to the hospital (Tr. pp. 502-503). Mitchell takes Turner to his doctor appointments and stays with him because he won't go in to see a doctor by himself (Tr. p. 503). Mitchell further testified that Turner suffers from a lot of anxiety and becomes very quiet when he's around people (Tr. p. 503). Mitchell testified that she sees Turner daily when he's

living with her, and has contact with him about every other day if he is living somewhere else (Tr. p. 504).

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a). The sequential process required the ALJ to determine whether Turner (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work he did in the past; and (5) can perform any other type of work. If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 914 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995), citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir.1987).

To be entitled to benefits, an applicant bears the initial burden of showing that he is disabled. Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis. Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy. Greenspan, 38 F.3d at 237.

In the case at bar, the ALJ found that Turner has not engaged in substantial gainful activity since May 20, 2002, his disability

insured status expired on April 1, 2003, and he has severe impairments of bipolar disorder, depression, hepatitis C, Chronic shortness of breath, and a history of poly substance abuse in remission, but does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1 (Tr. pp. 18-22). The ALJ also found that Turner is unable to perform his past relevant work (Tr. p. 25). At Step No. 5 of the sequential process, the ALJ further found that Turner has the residual functional capacity to perform the full range of light work except as reduced by his inability to ascend or descend stairs, more than occasionally balance, stoop, crouch, kneel, or crawl, or inability to work around hazardous machinery and unprotected heights (Tr. p. 24). The ALJ found the claimant is a younger individual with a high school education, no transferable work skills (Tr. pp. 25), can work in low stress, simple, unskilled jobs with one, two, or three step instructions, cannot be in close proximity to coworkers and have direct contact with the public, and his ability to concentrate on complex, detailed tasks is affected by his depression (Tr. p. 24). The ALJ concluded there are a significant number of jobs in the national economy which Turner can perform, such as tube operator, surveillance system monitor, and photo copy operator (Tr. p. 26) and, therefore, Turner was not under a "disability" as defined in the Social Security Act at any time through the date of the ALJ's decision on October 28, 2005.

<u>Law and Analysis</u>

Turner contends the ALJ erred in finding his statements were

22

not credible.  Turner also contends the ALJ did not give sufficient weight to the findings and opinions of the treating physicians.  The ALJ state in his opinion that he gave more weight to the opinions of the non-examining disability determinations physicians than to the Turner's treating physicians.

Although a claimant's assertion of pain or other symptoms must be considered by the ALJ, 42 U.S.C. § 423(d)(5)(A) requires that a claimant produce objective medical evidence of a condition that reasonably could be expected to produce the level of pain alleged.  The mere existence of pain or other symptoms does not automatically create grounds for disability, and subjective evidence will not take precedence over conflicting medical evidence.  Harper v. Sullivan, 887 F.2d 92, 96 (5ᵗʰ Cir. 1989), citing Owens v. Heckler, 770 F.2d 1276, 1281 (5ᵗʰ Cir. 1985).

A claimant's symptoms, including pain, will be determined to diminish a claimant's capacity for basic work activities to the extent that the claimant's alleged functional limitations and restrictions due to symptoms can reasonably be accepted as consistent with the objective medical evidence.  20 C.F.R. §404.1529(c)(4).  Subjective complaints must be corroborated by objective medical evidence.  Chambliss v. Massanari, 269 F.3d 520, 522 (5ᵗʰ Cir. 2000).

The evaluation of a claimant's subjective symptoms is a task particularly within the province of the ALJ who has had an opportunity to observe whether the person seems to be disabled.  Elzy v. Railroad Retirement Bd., 782 F.2d 1223, 1225 (5ᵗʰ Cir.

1986); <u>Loya v. Heckler</u>, 707 F.2d 211, 215 (5th Cir. 1983). Such a credibility determination is within the province of the ALJ. <u>Carrier v. Sullivan</u>, 944 F.2d 243, 247 (5th Cir. 1991); <u>Wren v. Sullivan</u>, 925 F.2d 123, 128-29 (5th Cir. 1991). Hence, the law requires the ALJ to make affirmative findings regarding a claimant's subjective complaints and articulate his reasons for rejecting any subjective complaints. <u>Falco v. Shalala</u>, 27 F.3d 162, 163-64 (5th Cir. 1994).

In the case at bar, the ALJ stated he did not find Turner's testimony credible because there were inconsistencies in Turner's testimony concerning when he discontinued using cocaine - he testified at his hearing it was in December 2002, while he told Dr. Bernard he had not used it since 2000 and, in 2004, told a FACT Program evaluator that he had not used it in five years (Tr. p. 24). Also, the ALJ stated that Turner alleged limitations due to back pain, but Dr. Chodosh stated there were no significant abnormal findings in Turner's back or spinal functioning and that he can walk, stand, and sit normally (Tr. p. 24). The ALJ also stated there was no indication in the administrative record that Turner's mental condition is disabling, noting that he is able to make and attend appointments, focus on the hearing, attend to his personal needs independently, and can read, watch TV, cook, walk his dog, and go shopping when necessary (Tr. p. 25). The ALJ reasoned that Dr. Yozgat's opinion as to Turner' psychiatric symptoms (which support Turner's claims) are not supported by any objective clinical testing and he failed to mention Turner's past drug abuse (Tr. p. 25).

Despite inconsistencies, it is apparent that Turner has not used cocaine since December 2002 at the latest; even the ALJ admitted in his findings that Turner no longer abuses drugs (Tr. p. 20). The evidence of record shows Turner used to self-medicate for his bipolar disorder with illegal drugs, but no longer does so, relying instead on consistent use of prescribed lithium and other medications. The ALJ also found Turner's subjective complaints of disability due to his bipolar disorder were not credible, despite the fact that Turner had been in a highly structured residential treatment facility for a year at the time of his administrative hearing - a state-operated facility which accepted Turner due to the severity of his mental disorder. The ALJ accepted the conclusions of the disability determinations psychologists, Val Bee and Gary Buffone, who examined Turner's medical records only and filled out forms as to Turner's limitations due to his bipolar disorder in 2003, concluding he would could work in a "well-structured task activity which involves only limited amounts of superficial interaction" (Tr. p. 264) and "may have some difficulty with maintaining focus but can carry out simple tasks and instructions" (Tr. p. 307).

The treating physician's opinion is entitled to more weight than that of a consulting physician who has never examined the applicant, or when the consulting physician examined the applicant only on a "one-shot" basis. Bowman v. Heckler, 706 F.2d 564, 568 (5th Cir. 1984), citing Oldham v. Schweiker, 660 F.2d 1078, 1084 (5th Cir. 1981), and cases cited therein; Warncke v. Harris, 619

F.2d 412, 416 (5th Cir. 1980); Strickland v. Harris, 615 F.2d 1103, 1109-1110 (5th Cir. 1980); Williams v. Finch, 440 F.2d 613, 616-17 & n. 6 (5th Cir. 1971). The courts also defer to the treating physician when the consulting physician examined the applicant only on a "one-shot" basis. Bowman v. Heckler, 706 F.2d 564, 568 (6th Cir. ), citing Smith v. Schweiker, 646 F.2d 1075, 1081 (5th Cir. 1981), and Williams v. Finch, 440 F.2d 613, 616-17 & n. 6 (5th Cir. 1971). Only where there are serious questions as to: 1) the treating physician's qualifications, 2) the nature or duration of his relationship to the claimant, or 3) the sufficiency of the treating physician's medical data, would a different result lie. King, 742 F.2d at 973; Montijo v. Secretary of Health and Human Services, 729 F.2d 599, 602 (9th Cir. 1984). Also, Myers v. Apfel, 238 F.3d 617, 621 (5th Cir. 2001)(ordinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability). Little weight is accorded to the opinion of a reviewing physician if it is contrary to the opinion of the only physician to examine the patient. Strickland v. Harris, 615 F.2d at 1109-10. See also, Martin v. Secretary of HEW, 492 F.2d 905, 906-10 (4th Cir. 1974); Landess v. Weinberger, 490 F.2d 1187, 1189-90 (8th Cir. 1974).

In the case at bar, the ALJ rejected Dr. Yozgat's evaluation of Turner's limitations due to his psychiatric problems, stating Dr. Yozgat's evaluation was not properly supported, and adopted the evaluations of psychologists who had only examined Turner's past

medical records and had never seen Turner. The weight to be given a physician's statement is dependent upon the extent it is supported by specific clinical findings. <u>Elzy v. Railroad Retirement Board</u>, 782 F.2d 1223, 1225 (5th Cir. 1986); <u>Jones v. Heckler</u>, 702 F.2d 616, 621 (5th Cir. 1983).

Turner's three treating mental health professions, Barry Frenchman, Dr. Bernard-Patin, and Dr. Yozgat, all examined and evaluated Turner, and concluded that Turner suffers from bipolar disorder and requires a highly structured environment with medical care. Dr. Yozgat, the last psychiatrist in the administrative records who gave Turner mental health care, stated the Turner has depression with anhedonia and a pervasive loss of interest in almost all activities, appetite disturbance, sleep disturbance, decreased energy, feeling of guilt of worthlessness, and difficulty concentrating or thinking, and occasional paranoid thinking, and also suffers from manic syndrome with a decreased need for sleep, easily distracted, occasional hallucinations, marked restrictions of daily living, marked difficulties in maintaining social functioning, and marked difficulties in maintaining concentration, persistence, or pace. Dr. Yozgat also reported that Turner has a medically documented history of a chronic affective disorder of at least two years duration which has caused more than a minimal limitation of his ability to do basic work activities with repeated episodes of repeated decompensation, each of extended duration, residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change

in the environment would be predicted to cause Turner to decompensate, and a current history of one or more years inability to function outside of a highly supportive living arrangement with an indication of continued need for such an arrangement (Tr. pp. 423-425).

The ALJ erred *as a matter of law* in giving more weight to the 2003 conclusions of non-examining, non-treating mental health care physicians, than to the 2004 and 2005 findings and conclusions of Turner's three treating mental health care professionals (one therapist and two psychiatrists). Moreover, the ALJ's conclusions that Turner's complaints of limitations due to his bipolar disorder were not credible is unsupported by the administrative record and appears to have been influenced by the fact that Turner used illegal drugs in the past. Although the ALJ referred several times to Turner's past illegal drug use in his opinion, the ALJ did not find substance abuse was a contributing factor material to Turner's disability.[6] In fact, the record shows Turner had not used illegal drugs for at least three years prior to his hearing. Turner's complaints as to his limitations due to bipolar disorder are supported by the findings of his Frenchman, Dr. Bernard-Patin, and Dr. Yozgat.

---

[6] If there is medical evidence in the record of drug addiction or alcoholism, the ALJ must determine whether that substance abuse is a contributing factor material to the determination of disability. The claimant bears the burden of proving that drug or alcohol addiction is not a contributing factor material to his or her disability. <u>Brown v. Apfel</u>, 192 F.3d 492, 498 (5th Cir. 1999). Also, <u>Smith v. Astrue</u>, 2008 WL 2325637 (5th Cir. 2008).

Therefore, the ALJ's credibility choices in this case are not reasonable, and his finding that Turner's bipolar disorder symptoms would not prevent Turner from performing work is not proper. <u>Carry v. Heckler</u>, 750 F.2d 479, 485-86 (5th Cir. 1985).

In fact, Dr. Yozgat's report (which is consistent with those of Frenchmen and Dr. Bernard-Patin) makes it clear that Turner meets Listing 12.4 for bipolar syndrome. If the claimant's condition is listed, or is medically equivalent to a listed impairment, the claimant is conclusively determined disabled. <u>Cieutat v. Bowen</u>, 824 F.2d 348, 351 n.1 (5th Cir. 1987). Also, <u>Selders v. Sullivan</u>, 914 F.2d 614, 619 n. 1 (5th Cir. 1990). A claimant has the burden of proving that his condition meets or equals an impairment listed in Appendix 1. <u>Sullivan v. Zebley</u>, 493 U.S. 521, 110 S.Ct. 885, 891-92, 107 L. Ed. 2d 967 (1990). <u>See also</u>, <u>Selders v. Sullivan</u>, 914 F. 2d 614, 619(5th Cir. 1990). For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify. <u>Sullivan v. Zebley</u>, 110 S. Ct. at 891.The ALJ is charged with carefully considering all the relevant evidence and linking his findings to specific evidence. A bare and summary conclusion that a plaintiff does not meet the criteria of any listing is beyond meaningful judicial review. <u>Drapeau v. Massanari</u>, 255 F.3d 1211, 1213 (10th Cir. 2001).

Listing 12.04, Affective disorders, states:

Characterized by a disturbance of mood, accompanied by a full of partial manic or depressive syndrome. Mood

29

refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.
The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
A. Medically documented persistence, either continuous or intermittent, of one of the following:

                *          *          *

3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);
AND

                *          *          *

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
1. Repeated episodes of decompensation, each of extended duration; or
2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

According to Dr. Yozgat's report, Turner meets A, B, and C in Listing 12.04(3). Since the medical records before this court show Turner was diagnosed with and began treatment for bipolar syndrome on April 1, 2003, he met Listing 12.04 on April 12, 2003, two years from the date he was diagnosed and began treatment. The record is replete with documentation showing Turner's bipolar disorder caused a more than minimal limitation in his ability to do basic work activities during that time period. Therefore, Turner carried his burden of proving that he meets Listing 12.04, and substantial evidence does not support the Commissioner's conclusion that Turner is not disabled.

Since substantial evidence does not support the conclusions of the Commissioner, his decision is incorrect as a matter of law. Moreover, the record shows that Turner meets Listing 12.04 for bipolar syndrome as of April 12, 2003. Therefore, judgment should be entered in favor of Turner, awarding him SSI benefits based on a disability onset date of April 12, 2003, and Turner's case should be remanded to the Commissioner for further proceedings to compute the amount of Turner's benefits.

Although Turner also applied for DIB, he last worked on May 20, 2002 and his disability insurance status expired on April 1, 2003 (Tr. p. 20). The medical evidence of record does not indicate that Turner carried his burden of proving he met the listing for bipolar disorder prior to April 12, 2003 and, therefore, did not carry his burden of proving he was disabled by his bipolar disorder prior to expiration of his disability insured status on April 1, 2003. The ALJ's conclusion that Turner is not eligible for DIB should be affirmed.

Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that the final decision of the Commissioner be AFFIRMED as to the denial of disability insurance benefits and REVERSED as to the denial of supplemental security income benefits and that a JUDGMENT BE ENTERED IN FAVOR OF TURNER, AWARDING TURNER SSI BENEFITS based upon a disability onset date of April 12, 2003.

IT IS FURTHER RECOMMENDED that Turner's case be REMANDED to the Commissioner for further proceedings to determine the amount of SSI

benefits to which Turner is entitled.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **ten (10) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **ten (10) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this 25th day of July, 2008.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE